United States District Court
Southern District of Texas
**ENTERED**
September 25, 2026
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| WILLIAM HENRY KRIEG, TDCJ #01366694 | § | |
| Plaintiff, | § | CIVIL ACTION NO. H-24-4196 |
| v. | § | |
| BRYAN COLLIER, *et al.*, | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

William Henry Krieg is incarcerated in the Pack I Unit of the Texas Department of Criminal Justice – Correctional Institutions Division (TDCJ), located in Navasota, Texas. Krieg, representing himself, filed a civil rights action under 42 U.S.C. § 1983 suing Bryan Collier, Executive Director of TDCJ; Kolton Stoker, Pack I Unit Senior Practice Manager; and Dana Sullivan, Pack 1 Unit Assistant Warden, alleging that they have been deliberately indifferent to his need for medical care by denying him a back brace that was prescribed for him by physicians at the University of Texas Medical Branch (UTMB) hospital in Galveston, Texas, and at the Pack I Unit. He also alleges that the defendants engaged in ultra vires actions under the Texas Uniform Declaratory Judgment Act.

The defendants have moved for summary judgment (Docket Entry No. 16) and Krieg has responded by filing his own motions for summary judgment (Docket Entry Nos. 17, 18; Docket Entry No. 20). The defendants have replied to Krieg's motion. (Docket Entry No. 21). Having reviewed the pleadings, the motions, the record, and the applicable law, the court grants the defendants' motion for summary judgment, denies Krieg's motions for summary judgment, and

dismisses this case. The reasons are explained below.

## I. Background

### A. Krieg's Allegations

The allegations in this section are taken from Krieg's verified complaint and attached exhibits. (Docket Entry No. 1-2). In March 2015, Krieg was a passenger in a TDCJ van that was in an automobile accident. (*Id.* at 4). In August 2017, after numerous medical visits, physicians at the John Sealy Hospital in Galveston ordered a CT scan, which revealed serious injuries to Krieg's spine, including a compression fracture in one of his vertebrae. (*Id.* at 4–5). UTMB physicians ordered an Aspen Vista TLSO 464 back brace ("TLSO brace") with an extension panel for Krieg to help stabilize his back and help the fracture heal. (*Id.* at 5, 17–18). Krieg received the brace on April 11, 2018, at the Jester III Unit. (*Id.* at 5, 21). In July 2019, UTMB physicians ordered Krieg to be provided with a replacement TLSO brace. (*Id.* at 5). This brace was issued and fitted in September 2019. (*Id.* at 5, 23–27).

In February 2020, Krieg underwent back surgery to fuse the vertebrae that had been damaged in the 2015 bus accident. (*Id.* at 5). Shortly thereafter, the COVID-19 pandemic shut down the Brace and Limb Clinic. (*Id.*).

Sometime between 2020 and 2022, Krieg was transferred from TDCJ's Jester III Unit to the Pack I Unit. In October 2022, Krieg was seen at the UTMB Neurology Clinic. (*Id.*). The physicians there ordered that he be provided with a replacement TLSO brace. (*Id.*). On October 10, 2022, Pack I Unit physician Dr. Samuel Adesoba saw Krieg and prescribed the TLSO brace. (*Id.*).

On October 12, 2022, Krieg submitted an I-60 to Ms. Land at the Pack I Unit medical supply, explaining that Dr. Adesoba, after reviewing the Neurology Clinic at Hospital Galveston's

recommendations, ordered that he be provided with the TLSO brace. (*Id.* at 5–6, 43–44). Krieg further stated that Hospital Galveston would not provide the brace and that it must be "obtained on the prison side." (*Id.* at 43–44). He asked that if TDCJ is unable to order the brace, whether his family could order it and have it shipped to the unit. (*Id.* at 5–6, 43–44). Ms. Land responded that he had an appointment the following week where Hospital Galveston would provide the brace. (*Id.* at 5–6, 44, 47). Krieg then filed an I-60 with Pack I Unit Senior Practice Manager Kolton Stoker, asking whether he could have his family order the brace for him. (*Id.* at 6, 46–49). Stoker responded that Hospital Galveston would provide the brace. (*Id.* at 6, 47). Krieg next sent an I-60 to Warden Villalobos requesting approval for his family to purchase the brace. (*Id.* at 6, 49). Villalobos sent the I-60 to Stoker, who responded that it would be authorized if the warden approved it. (*Id.* at 6, 49). In early November 2022, Assistant Warden Dana Sullivan approved Krieg's request to have his family purchase and ship him the replacement TLSO brace. (*Id.* at 6, 51). Sullivan instructed Krieg to have his family send the brace to Sullivan's attention with Krieg's name "somewhere on the package." (*Id.* at 6, 51).

Krieg's family ordered the TLSO brace and sent it to Sullivan's attention at the Pack I Unit. (*See id.* at 6, 53). However, when it arrived, mailroom staff designated it as contraband and refused to allow Krieg to have it. (*See id.* at 53). Krieg attempted to resolve the issue with Sullivan, but Sullivan told Krieg that he would not release the brace to him because "Practice Manager Stoker said you don't need it." (*See id.* at 55). Krieg also learned that Stoker had told medical supply not to order the brace because "it costs too much." (*See id.*).

Krieg filed a Step 1 grievance over the denial of the replacement TLSO brace. (*See id.* at 6, 55). The response was that he was denied the brace "due to the amount of metal contained in

the brace which is a security concern." (*Id.* at 55–56). The response to his Step 2 grievance appeal said that he had been properly advised at the Step 1 stage. (*Id.* at 7, 58–59).

Krieg alleges that the TLSO brace comes with two metal extension rods that are needed for someone who is exceptionally tall. (*Id.* at 8). He alleges that he does not need the metal rods, and he would like the brace issued to him without the metal extension rods, just as he has received it from TDCJ in the past. (*Id.*). Krieg is assigned to work as a dorm janitor, a job that requires him to stoop and bend, carry a mop bucket, and swing a mop. (*Id.*). The lack of a replacement back brace is causing him pain and additional injury. (*Id.*). Krieg's mother wrote to TDCJ Executive Director Bryan Collier to complain about TDCJ's refusal to allow Krieg the same kind of brace that TDCJ had allowed him in the past, without raising a problem. (*See id.* at 7, 74). A patient liaison from Collier's office responded that he would not interfere with the decision. (*See id.* at 76).

Krieg sues the defendants in their official capacities only, asserting they have been deliberately indifferent to his need for medical care by denying him a back brace that was prescribed for him by both UTMB physicians and physicians at the Pack I Unit. As relief, Krieg asks the court to enter an order requiring that he be provided with the TLSO brace that has been prescribed for him by UTMB and TDCJ medical personnel. (*Id.* at 12).

**B. Procedural Posture**

Krieg originally filed this lawsuit in the 506th Judicial District Court in Grimes County, Texas, Cause No. 036511. (*Id.* at 2–76). The state court issued service by citation. (*Id.* at 96–109). The defendants answered the complaint, denying liability and demanding a jury trial. (*Id.* at 77–91). The defendants then removed to this court under 28 U.S.C. § 1446(a) and paid the filing fee. (Docket Entry No. 1).

The defendants have filed a motion for summary judgment, arguing that there are no material fact issues regarding whether the defendants consciously disregarded a substantial risk of serious bodily harm to Krieg. (Docket Entry No. 16). Krieg has responded to the defendants' motion for summary judgment and has also filed his own motions for summary judgment. (Docket Entry Nos. 17, 18; Docket Entry No. 20) The defendants have responded to Krieg's motion. (Docket Entry No. 21). Krieg has also filed an additional response. (Docket Entry No. 22).

**C. The Defendants' Motion for Summary Judgment and the Summary Judgment Evidence**

The defendants have moved for summary judgment, arguing that Krieg fails to establish a constitutional violation. In support of the motion, the defendants have submitted affidavits from Warden Sullivan (Docket Entry No. 16-1); Senior Practice Manager Stoker (Docket Entry No. 16-2); Dr. Uvieoghene O. Ughwanogho, Clinical Director of Physical Medicine and Rehabilitation Services for UTMB – Correctional Managed Care (Docket Entry No. 16-3); Dr. Rishi Rajiv Lall, Surgeon of Neurosurgery at UTMB (Docket Entry No. 16-4); and William McWhorter, UTMB Senior Practice Manager for the Jester III and Vance Facilities (Docket Entry No. 16-5). Also attached to the motion are relevant portions of Krieg's medical records. (*See* Docket Entry No. 16-3 at 18–138; Docket Entry No. 16-4 at 14–46).

1. <u>General background regarding medical care provided to TDCJ inmates</u>

In his affidavit, Dr. Ughwanogho describes the UTMB – Correctional Managed Care rehabilitate services available to TDCJ inmates:

> Since his injury in 2015, Krieg has received treatment from several different providers at different levels of care and specialization. He has received care at the Unit level, which means care given by the providers on the patient's unit of assignment. The level of care provided by a Unit Infirmary varies with the type of population housed at each unit. Krieg is housed at the Pack Unit, which provides a higher level of care because it houses an older population. When even higher levels of care are required or sought by a Unit provider, they can refer a patient to

one of the specialty clinics at Hospital Galveston ("HG"). When further specialized care such as physical therapy or orthotics are required, the patient will be referred to the appropriate department within the Rehabilitation Department of UTMB-CMC.[2] The Rehabilitation Department consists of Physical Therapy, Occupational Therapy, the Brace and Limb Clinic and Physical Medicine and Rehabilitation or PM&R Clinic.

The Brace and Limb Clinic has locations throughout the TDCJ with a location on the Jester III Unit and is the only medical department that can order customized orthotic-medical devices including the Aspen Vista TLSO 464.[3] If a HG specialist or a provider at the unit level believes an orthotic device such as a back brace would benefit a patient, the device must be approved and issued by the appropriate department within the Rehabilitation Department. This is done with an examination/evaluation of the patient by the specialists at the Brace and Limb clinic. After examination, if a brace or device is needed, it will be approved and ordered through approved channels within CMC. A Brace and Limb clinic provider can order the device themselves for the patient or they can ask the Practice Manager to place the order.

[2] UTMB-CMC is the branch of the UTMB system that operates within TDCJ facilities. It is entirely different from UTMB Hospital Galveston. UTMB-CMC does refer inmates to UTMB Hospital Galveston for higher levels of care than can be provided in TDCJ units, but UTMB Clinics and Hospitals in Galveston primarily serves non-incarcerated patients.

[3]A TLSO 464 is a rigid orthotic brace that provides support to the mid spine. It consists of a thick restrictive belt that usually contains no metal to be MRI safe. Manufacturers include a metal extension piece that attaches a chest pad to the belt to give the patient an even higher level of support. However, the Brace and Limb Clinic does not issue inmates this metal extension bar because it could be used as a weapon.

When UTMB orders a TLSO brace for a patient, they contact Hanger, a free world contractor that assists with measuring and fitting of devices to patients. Lower-level providers like physical therapists often make the initial decision to place an order for a brace after a visit with the patient about their subjective symptoms and a quick review of their medical charts. After a brace is approved for the patient, he must be transported to one of 4 TDCJ prison units where Hanger representatives work with UTMB-CMC Staff to be fitted for the brace. This process helps maintain consistency of care within the Rehabilitation Department. While that process is pending, a Brace and Limb MD will closely review the medical records of patients with outstanding orders to Hanger to determine if the patient should get the brace ordered by a lower-level provider. That MD may decide to affirm the order, cancel it, or defer it if more information is needed.

Patients are never refused TLSO braces because of the cost to TDCJ or UTMB-CMC, nor are they denied TLSO braces because of a lack of supply on the unit. TLSO braces must be specially fit to the patient, so a new brace must always be ordered from Hanger if a patient requires a TLSO.

> When a medical device is prescribed and ultimately issued to an inmate patient, they must also receive a "medical pass" for the device. This "medical pass" is not a prescription, it is an administrative document showing security officials the patient has medical approval for the device.
>
> Any provider above Registered Nurse can enter a medical pass into the Electronic Medical Record ("EMR") for a medical device. The patient is given a paper copy of the pass to show security or correctional staff (If a patient does not have a pass, it is my understanding security can confiscate the item.). Passes are renewed or discontinued by the appropriate provider depending upon the needs and condition of the patient. Sometimes, unit infirmary medical providers issue medical passes for devices that are only issuable by the Brace and Limb Clinic. In this case, the medical pass does not entitle the patient to the device. A Brace and Limb Clinic provider must still evaluate the patient, affirm or disregard the pass, and issue the medical device.

(Docket Entry No. 16-3 at 3–4).

2. <u>Chronology of Krieg's treatment concerning his back injury</u>

Krieg was injured in a TDCJ bus accident on March 21, 2015. (*Id.* at 4). He was seen by a medical provider following the accident where he complained of posterior neck tenderness and lower back and shin pain just below his knees. (*Id.*). X-rays taken on March 30, 2015. (*Id.*). The x-rays did not indicate a vertebral fracture. (*Id.*). On September 29, 2015, Krieg was evaluated by the Rehabilitation Department at the Beto Unit. (*Id.*). He was referred to Physical Therapy Services for the management of back pain following the March 2015 bus accident. (*Id.*). He attended eight sessions over the next three months. (*Id.*). On December 30, 2015, Krieg was discharged from physical therapy after several visits for lack of progress. (*Id.*). The provider recommended that Krieg allow a Hospital Galveston orthopedic specialist consultation and examination, but Krieg refused, stating that he was "afraid of riding the bus." (*Id.*).

On July 5, 2017, Krieg suffered a seizure and injured his back again. (*Id.* at 5). X-rays indicated a compression fracture of the T12 vertebral body. (*Id.*). Krieg was evaluated for additional physical therapy. (*Id.*). The physical therapist noted: "Pt showed impaired overall

functional mobility due to severe pain lower back areas with movement, however patient would benefit from skilled PT services to help improve his overall functional mobility strength, endurance, maximized his potentials, and safe level as possible." (*Id.*).

On August 9, 2017, Krieg was seen by Hospital Galveston Neurosurgery for the first time about his back pain. (*Id.*). The provider noted: "William Henry Kreig is a 49 year old who suffered from a seizure in early June and since then has had non improving back pain while at carol young rehab. Plain films found a T12 compression fracture with no other imaging. He has subjective leg weakness, no b/b incontinence, no numbness. He uses a wheelchair due to pain. Imaging: T12 compression fracture with over 50% loss of height." (*Id.*). The provider's plan was for a CT scan of the lumbar spine, to continue physical therapy, and issue Krieg a TLSO Brace. (*Id.*). Krieg underwent a course of physical therapy and was discharged on August 14, 2017. (*Id.*).

On October 18, 2017, Krieg was seen for a follow up appointment with Neurosurgery. (*Id.*). The provider's assessment and plan were as follows:

> This is a 50 year old male who with a chronic healing T12 compression fracture. There is no worsening of his kyphosis. There is no radiographic evident of compression of the spinal cord or nerves, and the clinic symptoms that he is reporting are not consistent with that either. He has not weakness, numbness, or paresthesia. His complaint is axial back pain, and as such any neurosurgical intervention is unlikely to significant improve his pain. He had multiple request(s) for wheelchair and other activities restriction. While these are not necessarily unreasonable, neurosurgery is not the best equipped to evaluate or follow long term the need for these restriction(s). I would defer the restrictions and necessary equipment recommendations to physical and occupational therapy.

(*Id.*).

On October 26, 2017, Krieg was seen by the Brace and Limb Clinic for the first time. (*Id.* at 6). After reviewing the July 5, 2017, x-ray, the treating physical therapist "Consulted Dr. Abron-the [Physical Medicine and Rehabilitation (PM&R)] provider at the time-for approval of the TLSO

brace from Hanger. Dr. Abron approved."[1] (*Id.*). On February 7, 2018, Kreig was measured and fit for the TLSO brace by Dr. Abron along with a Hanger representative. (*Id.*). Dr. Abron noted that she was prescribing the brace to "stabilize and offload the fracture site to allow healing and reduce pain" with an assessment indicating Krieg's history of T12 compression fracture. (*Id.*). A "464 TLSO Anterior TLSO" brace was issued to Krieg on April 11, 2018. (*Id.*).

From July 3, 2018, until October 2, 2018, Krieg underwent a third course of physical therapy. The discharge summary indicates that many of the short-term goals including "decrease pain level to 3-5/10," or "prevent onset of muscle tightness on lumbar spinal muscles," and "improved lumbar spine stability" were not met. (*Id.*).

On July 10, 2019, Krieg is seen again by a Hanger representative because the TLSO brace was "broken beyond repair." (*Id.*). A replacement TLSO brace was ordered and was issued to Krieg on September 11, 2019. (*Id.*).

On January 9, 2020, Krieg was examined via Telemed by the Neurosurgery Specialty Clinic at Hospital Galveston. (*Id.*; Docket Entry No. 16-4 at 2). The provider noted that Krieg had a history of "t12 compression fracture with 80% height loss from an accident in 2015. He continues to have severe axial back pain with movement and twisting. He wears a brace to help the pain. He is interested in surgery; no conservative treatment has worked. Denies b/b dysfunction, denies radiculopathy." (Docket Entry No. 16-3 at 6; Docket Entry No. 16-4 at 2). Dr. Lall, who was the attending physician for the visit, concluded at that time: "Severe intractable back pain, Greater than 80% collapse, failed conservative management. Will plan for T10-L2 perc fusion." (Docket Entry No. 16-4 at 2; *see also* Docket Entry No. 16-3 at 6). On February 4, 2020, Krieg underwent a successful T10-L2 percutaneous fusion for the T12 fracture at Hospital

---

[1] Hanger is the TDCJ approved vendor for the Brace and Limb Clinic. (Docket Entry No. 16-2 at 3).

Galveston. (Docket Entry No. 16-3 at 6; Docket Entry No. 16-4 at 2). Dr. Lall was the supervising surgeon during the procedure. (Docket Entry No. 16-4 at 2). In his declaration, Dr. Lall explains why he did not prescribe a TLSO brace for Krieg following surgery:

> I did not prescribe a Tl.SO brace because it was not needed for [Krieg's] post-surgical healing. TLSO braces are used as a nonoperative treatment option for spinal fractures. They are occasionally issued post spinal fusion surgery, but even then, it will only be recommended for four to six weeks unless there is evidence of a new spinal fracture of the surgery was unusually complicated. If use of a TLSO 464 brace were critical to Krieg's recovery after surgery, the discharge notes would have contained a schedule and timeframe for use.

(*Id.* at 3; *see also* Docket Entry No. 16-3 at 6).

On June 25, 2020, Krieg was seen for a follow up by the Neurosurgery Clinic. (Docket Entry No. 16-3 at 6). The provider notes from the appointment reported: "His back pain is greatly improved. Leg strength and sensation intact . . . June 2020 xrays shows good hardware alignment. Patient would benefit from occupational therapy and physical therapy at unit, would benefit from transfer to another unit if not available." (*Id.*). The provider made recommendations for Durable Medical Equipment items such as a "Reacher" and a "Sockaid" because of the "lack of flexibility from thoracolumbar fusion." (*Id.* at 6–7). The provider felt a medical mattress was reasonable but did not specifically recommend one. (*Id.* at 7). There was no recommendation for a TLSO brace. (*Id.*).

Krieg participated in a course of physical therapy from March 24, 2021, until July 9, 2021. (*Id.*). During this course of physical therapy, on May 5, 2021, Brace and Limb Clinic providers issued an over-the-counter back brace/support, called a Bio Skin Back Brace, rather than a new TLSO to replace Krieg's yet again broken TLSO. (*Id.*). This type of brace does not require a prescription. (*Id.*).

On June 24, 2021, Krieg was seen by the previous Physical Medicine and Rehabilitation provider at the Brace and Limb Clinic, Dr. Koriandr Williams. (*Id.*). While Dr. Willaims was determining Krieg's suitability for a therapeutic mattress, she also made the following recommendation regarding the continued use of the TLSO brace: "2. Do *not* recommend TLSO brace at this time since it may worsen pain and weaken muscles, thereby encouraging further debility. Recommended therapy to strengthen core/back mucles and teach joint preservation techniques but pt declined. Advocated regular activity and stretching through HEP (Home Exercise Program)." (*Id.*).

On October 6, 2022, Krieg was seen at the Hospital Galveston Neurology Clinic. (*Id.*). In the "Plan" section of the note, the provider asked that Krieg be provided with a "TLSO Aspen Vista 464." (*Id.*). The plan also stated, '"Will consider Neurosurgery referral on next OV" and "lumbar X-ray." (*Id.*). On October 10, 2022, Dr. Adesoba, the Pack Unit medical provider, saw Krieg and recommended that Krieg follow up with Neurosurgery. (*Id.*). Dr. Adesoba renewed the brace pass for the old TLSO brace. (*Id.*). He did not prescribe or order Krieg a new TLSO brace. (*Id.*).

On October 26, 2022, Krieg was seen at the Neurosurgery Clinic at Hospital Galveston. (*Id.*; Docket Entry No. 16-4 at 3). Dr. Lall explains why further use of a TLSO brace was not recommended at this point:

> We did not recommend continued use of the TLSO. It was not recommended because the patient should not have needed it without a new injury. Issuing the brace almost 24 months post-surgery would be highly unusual and potentially harmful if not medically indicated. Additionally, I am aware of at least one recent reputable study that shows there is no advantage to bracing after surgery for thoracolumbar fractures.

(Docket Entry No. 16-4 at 3 (internal footnote omitted); *see also* Docket Entry No. 16-3 at 7). In his declaration, Dr. Lall comments on Krieg's October 6, 2022, visit with the Hospital Galveston Neurology Clinic:

> I am aware [Krieg] was given a recommendation by the HG Neurology department for replacement of the TLSO Brace. This recommendation was done via telemedicine on October 6, 2022. I have reviewed the note and cannot find anything other than the patient's subjective complaints, that would necessitate the prescription of a TLSO Brace. Post spinal fusion patients would usually be referred directly to the HG Neurosurgery Clinic for back pain after surgery rather than to the HG Neurology Clinic. The HG Neurosurgery Clinic is more appropriately equipped to evaluate whether a patient requires a TLSO Brace after spinal surgery. The HG Neurosurgery clinic saw the patient 20 days after the HG Neurology Clinic and found nothing requiring such an orthotic device. The Neurosurgery provider did order an MRI, however, it was never scheduled. An MR1 would not have identified new fractures that would indicate a need for a new TLSO 464. Rather it was ordered to ensure that there was no new problem unrelated to Krieg's spinal surgery—like disc herniation or a pinched nerve.

(Docket Entry No. 16-4 at 3) (internal footnote omitted).

In late 2022 to early 2023 TDCJ implemented a temporary policy that allowed inmates' family members to send medical devices to inmates who were authorized to possess those devices. (Docket Entry No. 16-2 at 3). This was a temporary practice implemented at the Pack Unit to allow inmates to receive mobility devices, generally consisting of walkers, rollators, and wheelchairs. (*Id.*). During this time, when a device arrived at the unit, Senior Practice Manager Stoker[2] would check to make sure the inmate had a current medical pass for the item. (*Id.*). If the

---

[2] Stoker describes the role of a Practice Manager:

> Practice Managers are not medical providers and do not take part in providing care for patients on the prison units they are assigned to oversee. Practice Managers are administrative positions that help to monitor care delivered by [University of Texas Medical Branch Correctional Medical Care (UTMC/CMC)]. They ensure that processes are in place to facilitate access to health care for inmates. I am familiar with UTMB/CMC and Correctional Managed Health Care (CMHC) policies and procedures with respect to the provision of medical care and the issuance of medical devices.

(Docket Entry No. 16-2 at 2–3).

pass was current, the device was inspected by Stoker and unit security for alterations or other concerns that could potentially be a security threat. (*Id.*). If there were no issues, the device was given to the inmate. (*Id.*). If a device was rejected, the inmate would be called down to the infirmary where the decision was explained to them, and an administrative note was entered into the "EMR" for the medical provider's information and review. (*Id.*). This practice was discontinued on November 2, 2023, and inmates can now only get medical devices through UTMB-CMC and TDCJ approved vendors such as Hanger. (*Id.*).

Relying on this temporary practice of family members providing medical equipment, on November 2, 2022, Senior Practice Manager Stoker responded to an I-60 request sent by Krieg asking if his family could send him a TLSO brace that he had been prescribed but had not received. (*Id.*). Stoker reviewed Krieg's medical passes and saw that Krieg did have a pass for a back brace. (*Id.*). Stoker is not a medical provider and he did not have access to Krieg's full medical records. (*Id.*). Because Krieg had a pass for a back brace, Stoker "took [Krieg] at his word and told him that he could receive the brace from his family *if* the warden agreed." (*Id.*) (emphasis in original). Stoker further states that he does not have "authority to refuse patients medical devices for any reasons other than security concerns" and that he has "no part in deciding whether an inmate needs a medical device, nor do I refuse devices for budgetary reasons." (*Id.* at 4; *see also* Docket Entry No. 16-5).

On January 18, 2023, the TLSO brace arrived at the Pack Unit. (Docket Entry No. 16-2 at 3). Stoker examined the package and "saw a large metal bar that made [him] concerned that the brace posed a significant security risk." (*Id.*). As part of his job, Stoker must inform the warden of any "potential threats, hazards, problems, or general information they need to be made aware of." (*Id.* at 4; *see also* Docket Entry No. 16-5). Stoker believed the warden needed to be informed

about the brace because the brace was sent in from the free world, was not obtained through proper UTMB channels, and had metal rods that could be used as a weapon. (Docket Entry No. 16-2 at 4; *see also* Docket Entry No. 16-5 at 3). Stoker brought the brace to Assistant Warden Sullivan. (Docket Entry No. 16-1 at 3). As assistant warden, Sullivan has no authority to override a UTMB medical provider's order for a medical device for an inmate, as long as that device does not constitute a security threat. (*Id.* at 2). Should an item be determined to pose a security threat, alternatives are sought by UTMB–CMC which will not pose a potential security threat while also meeting the inmate's medical needs. (Docket Entry No. 16-5 at 3). Sullivan and Stoker determined that the bars in the TLSO brace provided by Krieg's family posed a significant security risk. (Docket Entry No. 16-1 at 3; Docket Entry No. 16-2 at 4). An entry was then made in Krieg's electronic medical record, which would let any provider know that the brace had been denied and the reasons for the denial. (Docket Entry No. 16-5 at 3). Stoker told Kreig that his family could send a back brace without rods due to the warden's prior approval and the new brace would be given to him. (Docket Entry No. 16-2 at 4).

On March 23, 2023, a referral was placed by the Pack Unit medical provider to the Brace and Limb Clinic for "Replacement of broken back brace." (Docket Entry No. 16-3 at 7). Krieg was seen by a physical therapist for this evaluation on July 21, 2023. (*Id.*). At that time, the physical therapist requested that "a CCA can contact Hanger to see if they bring size XL Aspen TLSO brace for him." (*Id.* at 8).

On September 1, 2023, Krieg was seen by a physical therapist who noted: "Assessment: PT explain to him that his TLSO brace was denied. Pt got upset and said I am going to talk to my lawyer and Judge. HG recommends TLSO back brace and not sure why PMR doctor denied my back brace. Pt left the clinic." (*Id.*). In his declaration, Dr. Ughwanogho explains that this note

was charted after he reviewed Krieg's upcoming Brace and Limb appointments. (*Id.*). Upon reviewing Krieg's chart, Dr. Ughwanogho, as the Physical Medicine and Rehabilitation provider, "felt it necessary to defer issuance of the TLSO pending further examination and discussion with the patient." (*Id.*). Dr. Ughwanogho goes on to explain:

> The physical therapy note from September 1, 2023, was then amended by me on September 4, 2023, with the following: "Patient is s/p T10-L2 perc fusion for T12 fx on 2/4/2020. He last saw neurosurgery in Oct. 2022 and at the time, no recommendations re: the TLSO made. Rather, continuation was recommended by neurology, also in Oct 2022. Patient is post-op and continues to have axial low back pain. NSGY most recent recommendations was for repeat MRI. This has not been completed. Prior to simply recommended continuation of a TLSO (which is usually used in the setting of acute vertebral compression fractures, and not typically used for long term a sit severely limits spinal mobility) plan is for the following:
>
> - Schedule PM&R apt to further assess patient and discuss possible options/plan
> - Refer patient back to NSGY for further assessment and recommendations

(*Id.*). Krieg was given an "expedited" referral to Hospital Galveston Neurosurgery with the stated reason for referral being, "Persistent LBP (low back pain), pls eval and manage, also recommendations re: continued use of TLSO?" (*Id.*). Dr. Ughwanogho states that Krieg was "given another 'expedited' referral . . . so the rationale for deferral of the TLSO brace could be explained [to Krieg] in greater detail and to answer any follow up questions." (*Id.*).

On October 2, 2023, Dr. Ughwanogho met with Krieg via Telemed. (*Id.*). Dr. Ughwanogho's assessment and plan were as follows:

> A/P: We discussed at length what a possible option is. I stated that a TLSO this far out and for chronic pain, is typically not indicated. He states he does not use it all the time. "I like what I have." I advised that this may limit his back/core mobility and strength. He insists on continued usage. I offered a lumbar support sleeve as a possible option and he declined, stating he had one and did not help. No further need for PROST referral.

> He insists he will simply continue to use his old pair. Again, I do not recommend this. He also states he will consider going to NSGY (neurosurgery), though not enthusiastic about the ride to HG.

(*Id.* at 8–9). At Dr. Ughwanogho's recommendation, Krieg was scheduled for a Neurosurgery appointment at Hospital Galveston on November 8, 2023. (*Id.* at 9). Krieg, however, refused to attend. (*Id.*). He was rescheduled for another appointment with Neurosurgery on July 9. 2024. (*Id.*). Krieg again refused to attend. (*Id.*).

At the end of his declaration, Dr. Ughwanogho summarizes Krieg's current medical condition and the reasons for the denial of the TLSO brace:

> It should be noted that the TLSO brace was initially issued on April 11, 2018, and was prescribed by Dr. Abron to help protect the injured area while healing. TLSO braces largely immobilize the mid spine to prevent torque and pressure on the spine while it heals. This bracing was initially prescribed as part of the recommended conservative treatment regimen which also included physical therapy. Unfortunately, this conservative management of the injury failed to resolve his issues and surgery was required.
>
> After his surgery on February 4, 2020, there was not a provider order by HG ordering usage of the TLSO. It has been my experience, that if such a device is recommended by the provider postsurgery, it would be stated on the patient's discharge recommendations. Dr. Lall, the surgeon who performed the procedure on Krieg made no such recommendations.
>
> The patient was seen by Neurosurgery on January 9, 2020. During this examination, the surgery was discussed with the patient. In these interactions prior to surgery, the provider will explain the procedure and the healing process the patient will undergo. The provider will issue his instructions to the patient in an after-visit summary. There is no mention of a brace in the summary. In my experience, if a provider wishes a patient to receive an orthotic device during the recovery process it will be documented in these notes. Dr. Lall did not make a recommendation for use of a TLSO brace post-surgery.
>
> [Krieg] was seen for a post-surgery follow-up with the Neurosurgery Clinic on June 26, 2020, and again no recommendations were made about use of TLSO bracing. Approximately one year later, on June 24, 2021, Krieg was examined by Dr. Koriandr Williams, a previous PM&R (Pain Management and Rehabilitation) Brace and Limb Clinic provider for the issuance of an orthopedic mattress. During

the examination for the mattress at Brace and Limb, it appears he requested a replacement TSLO brace. Dr. Williams did not agree with replacing the TLSO brace.

The first time a recommendation was made for issuance of the TLSO brace post-surgery was on October 6, 2022, more than 2 years after the spinal surgery. On October 10, 2022, Dr. Samuel Adesoba reviewed the recommendations and asked for a neurosurgery referral on the recommendations. This was done on October 26, 2022, when Dr. Lall examined the patient 3 weeks after the neurology visit and made no recommendation for continuation or issuance of a TLSO.

I encountered the TLSO brace issue involving this patient in the fall of 2023 while reviewing the upcoming appointment roster for the Brace & Limb Clinic. My interactions with him occurred approximately one year (Sept/Oct 2023) after he was last seen by Dr. Lall and the HG Neurosurgery team. From my review, I was aware he was requesting another prescription for a TLSO Aspen Vista 464 and the purpose of my visit with him was to determine if he did in fact need TLSO bracing.

After I met with the patient, I declined to renew his prescription for the TLSO brace for several reasons:

1. Based on my knowledge, experience and standard medical practice, the use of a TLSO following a traumatic spinal fracture is usually temporary, issued immediately following the incident and lasting no more than 12-weeks. This is based on the treating specialist's recommendations.

2. A TLSO (thoracolumbosacral Orthosis) are back braces that are used to manage spinal pathologies (i.e. traumatic vertebral fractures, spondylolisthesis, scoliosis, spinal stenosis, herniated disks, etc.) generally localized to the T6 to the L3-4 spinal regions. The Aspen TLSO is considered a semi-rigid orthosis that provide control of flexion, extension, lateral bending, and rotation using a three-point pressure system and circumferential compression. Prolonged use of rigid TLSO can pose risks to the user including reduced spinal range of motion, weakening of the lumbar stabilizing muscles, weakening of core muscle groups, skin issues, and in some cases respiratory complications.

Despite presumed usage of the TLSO, the patient continued to have back pain, and eventually required a spinal fusion. Thus, even with use of the TLSO and repeated physical therapy regimens, his back pain continued to the point where the decision was made to perform surgery. The efficacy of the TLSO in alleviating his persistent low back pain post-surgery was never confirmed by the neurosurgery team. After the surgery, the EMR was silent for any recommendations from the HG neurosurgery team to continue usage of the TLSO. This includes the October 26, 2022, visit with Neurosurgery.

> The surgical team did recommend an MRI of the spine; unfortunately, this had not been completed when I saw him in 2023. However, an Xray was completed on May 7, 2024. The findings were "Severe compression deformity of T12 vertebral body with posterior fusion changes spanning from T10 to L2. No hardware fracture hardware complication identified. The vertebral bodies are otherwise normal in height and alignment. The x ray did not reveal new trauma or injury.
>
> 3. After evaluation by a physical therapist and placement of the appointment list, I reviewed Krieg's chart and course of treatment prior to the examination as is my practice. After I completed my review of Krieg, I made the decision to defer issuance of a TLSO brace pending further input from the neurosurgery team. When I made this decision, I did not believe it would be clinically sound to order/issue a TLSO for Krieg without further work-up and input from the neurosurgery team. If Krieg were to use a TLSO when such use is not medically indicated, the brace could cause long term damage to Krieg's spine and the surrounding muscle. This is why I placed an "expedited" referral to the Neurosurgery Team before I met him as I believed his complaints (persistent pain even after fusion) were enough to ask for a reassessment as soon as possible. A referral appointment was made at HG and Krieg refused the appointment by signing an ROT on November 28, 2023.
>
> 4. The recommendations to "please provide patient with a TLSO Aspen Vista 464" made by the HG Neurology specialty service on October 6, 2022, is considered a recommendation, and not a direct order. A Specialist at HG can make recommendations for a patient, but ultimately, when that patient returns on the TDCJ unit, those recommendations are carried out based on the assessment and evaluation of the clinicians within the units. This exact process is demonstrated in the October 17, 2017, HG Neurosurgery Note. The MD discussed the patient's request for a wheelchair and concludes: "'While these (requests) are not necessarily unreasonable, neurosurgery is not the best equipped to evaluate or follow long temrm the need for these restriction(s). *I would defer the restrictions and necessary equipment recommendations to physical and occupational therapy* (emphasis added)."
>
> 5. Only the Brace and Limb Clinic—not the Pack Infirmary nor UTMB Hospital Galveston—can order and provide inmates with a physical back brace. Even if a unit infirmary provider issues a back brace pass, the Brace and Limb Clinic must evaluate the patient before ordering any orthotic device. Patients often arrive at the Brace and Limb clinic with a pass for a medical device issued by a unit infirmary provider and must be told that the pass does not entitle them to a new medical device.

(*Id.* at 9–11) (internal footnotes omitted).

## II. The Standards of Review

### A. Action Under 42 U.S.C. § 1983

Krieg sues the defendants under 42 U.S.C. § 1983. "Section 1983 does not create any substantive rights, but instead was designed to provide a remedy for violations of statutory and constitutional rights." *Lafleur v. Texas Dep't of Health*, 126 F.3d 758, 759 (5th Cir. 1997) (per curiam); *see also Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). To state a valid claim under § 1983, a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States, and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Gomez v. Galman*, 18 F.4th 769, 775 (5th Cir. 2021) (per curiam). When no competent evidence exists to sustain a finding that the defendant violated the plaintiff's constitutional rights, summary judgment is properly entered. *See, e.g.*, *Petzold v. Rostollan*, 946 F.3d 242, 249 (5th Cir. 2019).

### B. Motion for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Curtis v. Anthony*, 710 F.3d 587, 594 (5th Cir. 2013). The initial burden falls on the movant to identify "those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). The movant "may meet its burden by simply 'pointing to an absence of evidence to support the nonmoving party's case.'" *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 544 (5th Cir. 2005) (quoting *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003)).

Once the movant presents a properly supported motion for summary judgment, the burden shifts to the non-movant to show with significant probative evidence the existence of a genuine issue of material fact. *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000). The non-moving party must present specific facts which show "the existence of a 'genuine' issue concerning every essential component of its case." *Firman v. Life Ins. Co. of N. Am.*, 684 F.3d 533, 538 (5th Cir. 2012) (per curiam) (quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)). "Conclusory allegations" or "unsubstantiated assertions" do not meet the non-movant's burden. *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008).

A reviewing court "must view the evidence introduced and all factual inferences from the evidence in the light most favorable to the party opposing summary judgment . . . ." *Smith v. Reg'l Trans. Auth.*, 827 F.3d 412, 417 (5th Cir. 2016) (quoting *Hightower v. Tex. Hosp. Ass'n*, 65 F.3d 443, 447 (5th Cir. 1995)). Factual controversies, however, are resolved in favor of the non-movant only when "both parties have submitted evidence of contradictory facts." *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004) (quotation omitted). Without proof, a reviewing court will not assume that the non-movant could or would prove the necessary facts. *See McCallum Highlands, Ltd. v. Wash. Cap. Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995). Further, a court need not comb the record to find evidence that will permit a non-movant to survive summary judgment. *See Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006) (citing *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)).

### C. Pleadings by Self-Represented Litigants

Although Krieg is representing himself, "the notice afforded by the Rules of Civil Procedure and the local rules" is considered "sufficient" to advise a self-represented litigant of his

burden in opposing a summary judgment motion. *Martin v. Harrison Cnty. Jail*, 975 F.2d 192, 193 (5th Cir. 1992) (per curiam). Even a self-represented plaintiff must specifically refer to evidence in the summary judgment record to place that evidence properly before the court. *See EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 484 (5th Cir. 2014) ("Despite our general willingness to construe pro se pleadings liberally, we still require pro se parties to fundamentally abide by the rules that govern the federal courts. Pro se litigants must properly . . . present summary judgment evidence . . . .") (cleaned up).

## III. Discussion

Krieg alleges that the defendants are subjecting him to cruel and unusual punishment, in violation of the Eighth Amendment to the United States Constitution, by refusing to comply with the orders for medical care and treatment issued by UTMB and Pack I Unit physicians. Krieg's claims are governed by the Eighth Amendment, which protects inmates from cruel and unusual punishment arising from prison officials' deliberate indifference toward an inmate's injury or pain. *See Estelle v. Gamble*, 429 U.S. 97, 105, (1976). To prevail on a deliberate indifference claim, the inmate must prove that the prison official acted with "deliberate indifference" to a "serious medical need" in a manner that "constitutes the unnecessary and wanton infliction of pain[.]" *Id.* at 104 (cleaned up); *see also Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (emphasizing that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment") (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1988)). "To show an official was deliberately indifferent, a plaintiff must demonstrate that the official is aware that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Davis v. Lumpkin*, 35 F.4th 958, 963 (5th Cir. 2022) (quoting *Farmer*, 511 U.S. at 847) (cleaned up). This requires proof

that the defendant "had subjective knowledge of [the inmate's] exposure to harm," and "denied or delayed . . . medical treatment." *Petzold*, 946 F.3d at 249.

The deliberate indifference standard is "extremely high." *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001). "Deliberate indifference is more than mere negligence or even gross negligence." *Brown v. Callahan,* 623 F.3d 249, 255 (5th Cir. 2010). "Actions and decisions by officials that are merely inept, erroneous, ineffective or negligent" do not amount to deliberate indifference. *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 219 (5th Cir. 1998). Claims of "[u]nsuccessful medical treatment, acts of negligence, . . . medical malpractice" or "a prisoner's disagreement with his medical treatment" do not state a constitutional violation, "absent exceptional circumstances." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (cleaned up). Instead, to obtain relief for a constitutional violation based on deliberate indifference to medical needs, the inmate must show that prison officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* (cleaned up).

The defendants argue that they are entitled to summary judgment because the evidence does not show that they consciously disregarded a substantial risk of serious bodily harm to Krieg in this case. The summary-judgment evidence supports their argument. In his affidavit, Assistant Warden Sullivan states that "inmates can only receive medical devices from UTMB. I have no authority to override a UTMB medical provider's order for a medical device for an inmate, as long as that device does not constitute a security threat." (Docket Entry No. 16-1 at 2). Similarly, in his affidavit, Practice Manager Stoker states that "I have no authority to refuse patients medical devices for any reasons other than security concerns. I have no part in deciding whether an inmate needs a medical device, nor do I refuse devices for budgetary reasons." (Docket Entry No. 16-2

at 4). Krieg has not provided any evidence tending to contradict these assertions. The defendants' summary evidence shows that Sullivan and Stoker denied the issuance of the TLSO brace sent in by Krieg's family because they determined it constituted a significant safety risk—that is, the brace was confiscated for a security-related reason. The denial of medical equipment based on a security concern does not demonstrate deliberate indifference on the part of prison officials. *See Encarnacion v. Connors*, No. 9:21-CV-00986-MAD-TWD, 2023 WL 6546247, at *8 (N.D.N.Y. Aug. 7, 2023) (holding that prison officials denying an inmate plaintiff medical equipment based on "safety and security concerns" did "not constitute deliberate indifference because there was a 'legitimate penological reason' for doing so"), *R&R adopted,* No. 9:21-CV-986 (MAD/TWD), 2023 WL 6057393 (N.D.N.Y. Sept. 18, 2023); *Roundtree v. City of New York*, No. 15CV8198, 2018 WL 1586473, at *9 (S.D.N.Y. Mar. 28, 2018) (finding that prison officials denying the use of medical equipment because of security concerns is a "legitimate, penological reason" to do so).

Krieg's argument that he is entitled to the TLSO brace without the metal extension bar fares no better. The summary-judgment evidence, which includes medical records detailing the extensive treatment Krieg has received for his back, shows that a TLSO brace was not, and is not, medically necessary or prudent. As early as June 24, 2021, at least one physician with the Brace and Limb Clinic (Dr. Koriandr Williams) recommend that Krieg not continue use of the TLSO brace "since it may worsen pain and weaken muscles, thereby encouraging further debility." (Docket Entry No. 16-3 at 7). Krieg does not have a current prescription for a TLSO brace because no medical provider at the Brace and Limb Clinic—which is the only medical department in which a physician can order and provide inmates with a physical back brace—has determined one is medically necessary. (*See id.* at 9–11). To the contrary, Dr. Ughwanogho of the Brace and Limb Clinic has determined that a TLSO brace is not medically appropriate for Krieg because it could

harm him. (*Id.* at 11). Krieg has not shown that any of the defendants acted with deliberate indifference to his serious medical needs. The defendants' motion for summary judgment will be granted and Krieg's motions will be denied.

## IV. Remaining State Law Claims

Krieg purports to bring a claim under the Texas Uniform Declaratory Judgment Act. A federal district court has supplemental jurisdiction over state-law claims that are so related to the federal claims that they form part of the same case or controversy. 28 U.S.C. § 1367(a). A district court may decline to exercise supplemental jurisdiction over state law claims after dismissing the federal claims. *See St. Germain v. Howard*, 556 F.3d 261, 263–64 (5th Cir. 2009*); see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."). Generally, when all federal claims have been dismissed at an early stage, a district court should dismiss any pendent state-law claims without prejudice. *Bass v. Parkwood Hosp.*, 180 F.3d 234, 246 (5th Cir. 1999) ("When a court dismisses all federal claims before trial, the general rule is to dismiss any pendent claims.") (citing *Wong v. Stripling*, 881 F.2d 200, 204 (5th Cir. 1989)).

Krieg's federal claims have been dismissed. The court declines to exercise supplemental jurisdiction over any state law claims against the defendants. Any state law claims are dismissed without prejudice under 28 U.S.C. § 1367(c)(3).

## V. Conclusion

The motion for summary judgment filed by Bryan Collier, Kolton Stoker, and Dana Sullivan (Docket Entry No. 16) is **granted**. The claims brought under 42 U.S.C. § 1983 against these defendants are **dismissed** with prejudice. Any state law claims against the defendants are

**dismissed without prejudice**. Krieg's motions for summary judgment (Docket Entry No. 17 and Docket Entry No. 20) are **denied**. Any remaining pending motions are denied as moot. Final Judgment will be entered separately.

SIGNED on September 24, 2026, at Houston, Texas.

Lee H. Rosenthal
Senior United States District Judge